IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BROTHERHOOD OF MAINTENANCE )
OF WAY EMPLOYES, DIVISION, IBT )
)
)
*Plaintiff,* )
)
v. )
)
) Civil Action No. 8:20-cv-43
UNION PACIFIC RAILROAD, CO. )
)
*Defendant.* )
)

**PETITION FOR ENFORCEMENT OF ARBITRATION AWARD**

The Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or "Union") petitions this Court for an Order enforcing an arbitration award ("Award") issued by a Railway Labor Act ("RLA") arbitration board in a dispute between BMWED and the Union Pacific Railroad Company ("UP" or "Carrier"). A copy of the Award is attached to this petition, marked as Exhibit 1 and incorporated herein by this reference.

UP discharged one of BMWED's members. BMWED filed a "claim" or grievance on his behalf. The claim asserted that the action violated the parties' collective bargaining agreement. As a remedy, BMWED asked that its member be "reinstated to service, must have the matter stricken from his disciplinary record and be compensated for all losses." The Public Law Board sustained the claim by its Award dated May 14, 2018.

1

BMWED's member Marlin Perkins (the "Claimant") was reinstated by UP, but he was not made whole for his losses as required by the Award because UP did not comply with the Award as issued. UP unilaterally reduced Mr. Perkins's compensation for his financial losses, and imposed costs on him, even though his claim that he had been improperly discharged was sustained, and UP was directed to make him whole for his financial losses. BMWED seeks enforcement of the Award under Section 3 First (p) of the RLA, 45 U.S.C. §153 First (p).

## PARTIES

1. BMWED is an unincorporated labor association that maintains its headquarters in Novi, Michigan. BMWED is the duly designated representative for collective bargaining under Section 1 Sixth of the RLA, 45 U.S.C. §151 Sixth, of employees of UP working in the class or craft of maintenance of way employee, including UP maintenance of way employees who live and work in this District. On January 1, 2005, the BMWED became an autonomous division of the International Brotherhood of Teamsters. Prior to that date, BMWED was an international union founded in 1887 that went by the name Brotherhood of Maintenance of Way Employes.

2. UP is a rail carrier as that term is defined in Section 1 First of the RLA. UP conducts rail operations in many states in the midwest, south and west, including in Nebraska.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of this petition pursuant to 28 U.S.C. §§ 1331 and 1337, §§ 2201 and 2202; and 45 U.S.C. § 153 First (p).

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391 (b) and (c), and 45 U.S.C. §153 First(p) because UP owns and operates lines of railroad within this District and is headquartered in this District.

## STATEMENT OF THE CLAIM

5. On February 12, 2016, UP removed maintenance of way employee Marlin Perkins from employment with the Carrier.

6. BMWED filed a claim (grievance) on behalf of Mr. Perkins. The grievance asserted that the discharge was improper and in violation of the BMWED-UP collective bargaining agreement ("CBA"). For a remedy, BMWED asserted that Mr. Perkins "must be reinstated to service, must have the matter stricken from his disciplinary record and be compensated for all losses."

7. After handling of the claim under the CBA was completed, the claim was referred to Public Law Board No. 7660 ("PLB"), which was established under Section 3 Second of the Railway Labor Act ("RLA"), 45 U.S.C. §153 Second, to resolve claims and grievances that cannot be resolved by BMWED and UP. The Arbitrator and Neutral member of the Board was arbitrator Michael Capone.

8. On May 14, 2018, the PLB issued its Award in which it sustained the claim which was restated at the beginning of the Award.

9. The Award stated: "Claim sustained.". In sustaining the claim, the PLB granted the demand that Mr. Perkins be made whole for the financial losses listed in the claim.

10. While UP reinstated Mr. Perkins, the Carrier also unilaterally reduced his compensation for his financial losses in ways not provided for in the Award, and imposed costs on him, even though the PLB sustained his claim and ordered UP to make him whole for his financial losses. By doing so, UP arrogated to itself the ability to modify the Award and refused to compensate Mr. Perkins for all his losses that were specified in the claim which was sustained by the PLB.

11. In addition to wages, UP employees receive health insurance coverage paid for by the Carrier with employees paying a portion of the premiums.

12. Under the Railroad Employees National Health & Welfare Plan ("National Plan"), when an employee is reinstated after discharge, coverage is deemed retroactively applied and premiums for that period of coverage are due.

13. Railroad employees are covered by the Railroad Retirement Act of 1974 (45 U.S.C. § 231 *et seq.*) ("RRRA"). Carriers and employees pay Railroad Retirement taxes for employee coverage under the RRRA.

14. When an employee is reinstated after discharge, the employee is credited for RRRA service time for the period when they were wrongfully out of service. Accordingly, payroll taxes are assessed for accrual of RRRA service time.

15. The portion of the premiums for the National Plan and RRRA taxes that railroad employees are responsible for are not directly paid by employees. Instead, the money is withheld from employee paychecks by the Carrier.

16. In calculating the amount of compensation paid to Mr. Perkins pursuant to the Award, UP reduced the amount of compensation paid to Mr. Perkins by the amount of his outside non-UP earnings during the period he was discharged.

17. In accordance with the RRRA, UP made payments to the Railroad Retirement Board ("RRRB") for the employer's share of taxes for service credit for the period Mr. Perkins was discharged.

18. In accordance with the National Plan, UP made payments to the National Plan for the employer's share of health insurance coverage for Mr. Perkins for the period he was discharged.

19. For the employee's share, UP deviated from its practice with payments for other employees returned to work. Historically, the Carrier pays employee health care contributions and railroad retirement coverage out of the backpay due from UP before calculating the impact of outside earnings. Instead, in this case, the Carrier reduced its backpay obligation to Mr. Perkins by the amount of Mr. Perkins's outside earnings and then assessed him for the health care contributions and railroad retirement payments. The remainder of the backpay obligation after the offset for outside earnings was substantially lower than the employee contribution for health insurance and RRRA.

20. Mr. Perkins also received Railroad Unemployment Insurance during the period he was discharged and was obligated to reimburse the RRRB for the unemployment benefits he received. UP did not take that amount out of the back pay due to Mr. Perkins and instead left that obligation to him after offsetting the back pay due him by the amount of his earnings while improperly discharged.

21. As a result, rather than compensating Mr. Perkins for his losses, UP unilaterally eliminated its financial obligation to Mr. Perkins and is requiring him to contribute to the health plan and the Railroad Retirement Board out of his own funds – effectively converting an obligation of UP into an obligation of Mr. Perkins. By prevailing in arbitration, Mr. Perkins is being assessed a loss whereas UP has no make whole obligation – only payments of the employer's share of health insurance and RRRA contributions for the period of Mr. Perkins's discharge. The total amount UP would require Mr. Perkins to pay was $4,000.00.

22. BMWED has written to the UP's Director of Labor Relations asserting that UP's action was contrary to the Award because the Award expressly provided for Mr. Perkins's reinstatement and that Mr. Perkins would be "compensated for all losses" suffered as a result of the violation and did not set any other terms or limitations on his reinstatement.

23. The Carrier has refused to comply with the Award.

24. A neutral arbitrator found that UP had wrongly discharged Mr. Perkins and ordered UP to make him whole for all losses. UP's response to that order was to compel Mr. Perkins to pay $4,000.00 in order to return to work.

25. Additionally, Mr. Perkins had to purchase replacement health insurance while he was removed from employment because his health insurance ended while discharged.

26. UP did not compensate him for the premiums Mr. Perkins had to pay for the replacement health insurance he purchased while discharged, even though the Award sustained his claim to be "compensated for all losses".

27. BMWED has calculated that the total amount of backpay owed to Mr. Perkins is $4,000.00 as well as $44,167.87 for the additional cost of the healthcare plan that Mr. Perkins would not have paid had he not been unjustly removed from service.

## CAUSE OF ACTION

28. BMWED repeats and realleges herein the allegations contained in paragraphs 1-27 above.

29. Section 3 First (p) of the RLA, 45 U.S.C. § 153 First (p) provides that "[i]f a carrier does not comply with an order of" an arbitration panel under Section 3, a union may seek enforcement of the award in Federal District Court.

30. UP has failed and refused to comply with the Award because the Carrier unilaterally reduced Mr. Perkins compensation for his financial losses in ways not provided for in the Award; and UP has ignored the Award's requirement that Mr. Perkins be "compensated for all losses."

31. Because UP has failed to comply with Board's Order, BMWED is entitled to an order enforcing the Award, directing compliance with the Award in accordance with Section 3 First (p) of the RLA, 45 U.S.C. § 153 First (p), and requiring UP to pay the Union's attorneys fees in accordance with Section 3 First(p).

## REQUEST FOR RELIEF

WHEREFORE, BMWED respectfully requests that the Court:

A. Declare that UP did not comply with the Award because it unilaterally reduced Mr. Perkins's compensation for his financial losses, and imposed costs on him, even though his claim that he had been improperly discharged was sustained, and UP was directed to make him whole for his financial losses;

B. Declare that BMWED is entitled to enforcement of the Award in accordance with Section 3 First (p) of the Railway Labor Act, 45 U.S.C. § 153 First (p);

C. Enforce the Award and direct UP to comply with the Award;

D. Grant BMWED such other and further legal and equitable relief that the Court deems just and proper; and

E. Grant BMWED its attorneys' fees and costs of this action.

### REQUEST FOR PLACE OF TRIAL

The Plaintiff requests trial to be held at Omaha, Nebraska.

Respectfully submitted,

/s/ Richard S. Edelman
Richard S. Edelman
Aaron S. Edelman
Mooney, Green, Saindon, Murphy &
Welch, P.C.
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010
Redelman@MooneyGreen.com

/s/Robert E. O'Connor, Jr.
Robert E. O'Connor, Jr.
P.O. Box 451116
Omaha, NE 68145
(402) 330-5906
reolaw@aol.com

Counsel for the Brotherhood of Maintenance of Way Employes Division/IBT

January 25, 2020

PUBLIC LAW BOARD NO. 7660

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION - IBT<br><br>and<br><br>UNION PACIFIC RAILROAD COMPANY [FORMER CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY] | Case No: 71<br>Award No: 71 |

**STATEMENT OF CLAIM:**

"Claim of the System Committee of the Brotherhood that:

1. The Carrier's discipline (dismissal) of Mr. M. Perkins, by letter dated February 12, 2016, for alleged violation of General Code of Operating Rules (GCOR) Rule 1.6: Conduct - Negligent and Rule 43.5: Unattended Equipment was unjust, arbitrary, unwarranted and in violation of the Agreement (System File J-1619C-402/1653667 CNW).

2. As a consequence of the violation referred to in Part 1 above, Claimant M. Perkins must be reinstated to service, must have the matter stricken from his disciplinary record and be compensated for all losses."

**FINDINGS:**

This Board derives its authority from the provisions of the Railway Labor Act, as amended, together with the terms and conditions of the Agreement by and between the Brotherhood of Maintenance Employes Division – IBT (hereinafter referred to as the "Organization") and the Union Pacific Railroad Company (hereinafter referred to as the "Carrier"). Upon the whole record, a hearing, and all evidence as developed on the property, the Board finds that the parties herein are Carrier and Employee within the meaning of the Railway Labor Act, as amended; that this Board has jurisdiction over the dispute involved herein; and that the parties were given due notice of the hearing thereon. The Claimant was ably represented by the Organization.

The Claimant, Marlin Perkins, has been employed by the Carrier for approximately one year and held the position of Machine Operator when he was charged with violating


EXHIBIT 1

PLB No. 7660
Award No. 71

Rule 1.6, Conduct – Negligent and Rule 43.5, Unattended Equipment. The charges allege that on January 27, 2016, he did not properly secure a brush-cutting machine assigned to him and his co-workers on Gang 3282. The work arm of the equipment moved downward fouling the adjacent track and was struck by a passing commuter train.

On February 1, 2016, the Claimant was notified in writing by the Carrier to report for a hearing and investigation, which was held on February 4, 2016, regarding the aforementioned charges. On February 12, 2016, the Claimant was notified that the Carrier found him guilty of the charges and that he was dismissed from service. The record indicates that the Carrier denied subsequent appeals by the Organization and rendered its final decision to deny the claim on July 14, 2016. A conference was held on August 16, 2016, whereupon the matter was not resolved. The Organization moved to have the matter adjudicated before this Board.

The Carrier claims that it has established with substantial evidence that the Claimant failed to properly secure the brush cutter, which had been moved to a "hole" or side track for repairs. It argues that the Claimant, and the crew he was assigned to, Gang 3282, were responsible to insure that the damaged arm could not move on its own and foul the adjacent track.

The Carrier avers that the Claimant's failure to inform the Track Supervisor Chris Townsend that the brush cutter could not be properly secured demonstrates a disregard for the safety of the employees and the public. It argues that the Claimant was negligent in leaving the site of the defective brush cutter unsecured, which caused damage to the equipment and the commuter train, and also endangered the safety of the riding public. The Carrier cites numerous arbitral awards where dismissal for such conduct has been consistently upheld.

The Organization claims that the Carrier committed several procedural errors, which should prevent the Board from reaching the merits of the charges. It alleges that the Carrier violated Rule 19 when it failed to provide timely notice of the charges. The Organization argues that the Carrier officials were prejudicial toward the Claimant when it entered part of

PLB No. 7660
Award No. 71

a document as evidence but left out a section that was viewed as exculpatory. Further, the Organization maintains that the Carrier failed to produce the mechanic, Greg Krame, who was a material witness to the events surrounding the collision of January 27, 2016.

Turning to the merits the Organization argues that the witnesses' testimony is credible and consistent in establishing that the brush cutter was left under the supervision of the mechanic and not the Claimant. It alleges that during a conference call by speakerphone on January 27, 2016, the Claimant, his foreman, his co-worker, and the track supervisor received confirmation from the mechanic Greg Krame that the equipment was secured. Further, it asserts that the Claimant could not have left the equipment unattended as charged since the mechanic was working on the equipment and was the last person to operate it when the Claimant left the area to attend to other duties. According to the Organization, the Claimant, Gang 3282, and Townsend who was the superior Carrier official involved, relied upon the mechanic's expertise since he was there to attend to the defective equipment. The Organization maintains that the Carrier has failed to show how the Claimant knowingly and intentionally violated its rules when the mechanic was left in control of the equipment.

The Organization asserts that the Carrier should have followed the terms of the Safety Analysis Process (hereinafter referred to as the "SAP Agreement") instead of pursuing discipline. It contends that the parties agreed to use SAP in lieu of discipline except in certain circumstances. The Organization argues that the allegations against the Claimant should have been handled through the SAP Agreement and therefore, the Carrier acted arbitrarily by violating the terms of an agreement between the parties.

The Organization cites numerous awards by boards of adjudication to support its claim the Carrier has not met its burden of proof. It also cites awards to bolster its contention that it claims confirms that the Carrier was arbitrary and excessive in issuing a penalty of dismissal.

The Board first addresses the procedural errors claimed by the Organization and finds that none are fatal flaws preventing us from reaching the merits of the claim. The Organization's assertion that the Carrier violated Rule 19(A) of the Agreement is rejected.

PLB No. 7660
Award No. 71

The Claimant and his representative appeared for the hearing and investigation on February 4, 2016 after the Carrier sent its notice on February 1, 2016, which was received by the Claimant on February 2, two days before the hearing, as provided for in Rule 19(A). The rule states that two days is a reasonable time " . . . for the purpose of having witnesses and representatives . . ." appear at the hearing. As such, the Claimant received proper notice. The Board does not find that the other procedural objections prevent us from addressing the merits of the charges.

In Special Board of Adjustment No. 924, Award No. 9, it was found that the same rule was not violated where less than two days notice was provided and the claimant decided to continue with the hearing. The Board there concluded, "It is clear that the claimant and his representative willingly elected to proceed, and thereby waived any technical or procedural contention concerning the two-working day advance notice issue." The Claimant's decision here not to take advantage of the relief provided him through a postponement confirms his willingness and ability to proceed with his defense.

The Board notes here that this matter is based primarily on the same facts, circumstances and evidence reviewed in our Award No. 70. As we did there, the Board finds that the Carrier has not established with substantial evidence that the Claimant was negligent or that he left the brush cutter unattended and unsecured. The testimony by Track Supervisor Townsend, Foreman Clarence Hilson, and Brush Cutter Operator Michael Utley are consistent and establish that the machine operator Krame, who was called to address the brush cutter's malfunction, was responsible for securing the equipment and assured Townsend, in the presence of the Claimant, that it was safe to leave the equipment as positioned. The witnesses' testimony and that of the Claimant indicate that during the conference call between Townsend, Foreman Hilson, and the mechanic on January 27, 2016, it was clear that Krame described the mechanical issues and insured everyone that the equipment was secured and would not foul the adjacent track. Townsend, who supervised both the Claimant and the mechanic, testified that the mechanic did the risk assessment and that the equipment was secure. The record establishes that it was the mechanic's responsibility to address the defective brush cutter and based on the mechanical problem ascertain the proper remedy to secure the equipment. The Claimant and Utley testify that

PLB No. 7660
Award No. 71

Krame did not want to move the brush cutter because he was concerned that it could be unsafe because it was close to the adjacent main tracks and more damage could occur to the equipment. The testimony of the witnesses confirms that given the mechanical failure, everyone relied on the mechanic's assessment of the equipment and that he believed it was secure.

The claim by the Manager of Track Maintenance Daniel Elhosni that Gang 3282 did not do a risk assessment and was responsible for the safety of the equipment is unsupported by the record. Elhosni was not at the location when the equipment malfunctioned and did not witness the movement of the equipment or participate in the conference call. The Claimant and Utley, who were present during the conversation conducted by speakerphone between Townsend, Krame and Hilson, confirm that the mechanic did a risk assessment.

Given the mechanic's assessment and his discussion with Townsend, who testified that he relied on Krame's judgment, it was not unreasonable or negligent for the Claimant and Gang 3282 to rely on their decisions. The Claimant, Hilson, and Utley confirm that once the movement of the equipment into the "hole" was complete and the mechanic assured them of its safety, they were directed by Townsend to perform other duties, leaving the mechanic with the brush cutter.

The record does not support the Carrier's decision that the Claimant was negligent or that he left the equipment unattended. The decision to discipline the Claimant must be considered arbitrary and unwarranted.

In summary, we have reviewed and carefully weighed all the arguments and evidence in the record and have found that it is not necessary to address each facet in these Findings. We find that the Carrier has not established with substantial evidence that the Claimant violated Rule 1.6 or Rule 43.5 on January 27, 2016.

PLB No. 7660
Award No. 71

## AWARD

Claim sustained.

_____
Michael Capone
Neutral Member

Dated: May 14, 2018

_____
Alyssa K. Borden
Carrier Member

Dated: 05/16/18

_____
Andrew M. Mulford
Labor Member

Dated: 5/16/18